UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10310-GAO

GARY LUND d/b/a CLUB MARTINIQUE,
Plaintiff,

v.

CITY OF FALL RIVER,
Defendant.

OPINION AND ORDER
May 22, 2012

O'TOOLE, D.J.

The plaintiff contends that sections 86-88 and 86-201 of the Revised Code of Ordinances of the City of Fall River have zoned out adult entertainment in violation of the First Amendment to the United States Constitution and Article 16 of the Massachusetts Declaration of Rights.[1] At the hearing held on the plaintiff's motion for a preliminary injunction, Lund requested that his motion for preliminary injunction be consolidated with a trial on the merits under Rule 65 of the Federal Rules of Civil Procedure and that the Court, employing an intermediate level of scrutiny, focus solely on the question whether sections 86-88 and 86-201 provide reasonable alternative avenues for the location of adult entertainment clubs within Fall River. (June 3, 2010 Tr. 59:19-60:12; 61:1-11 (dkt. no. 23).) All other issues having been withdrawn, the Court now considers that narrowed question.

---

[1] At oral argument, Lund asserted that the First Amendment and Article 16 are coextensive for present purposes. This Opinion and Order addresses the constitutionality of sections 86-88 and 86-201 under the federal rubric.

**I.     Background**

To operate an adult entertainment establishment requires a special permit under the Revised Code of Ordinances of the City of Fall River. Fall River, Mass., Rev. Ordinances § 86-85. To obtain a special permit, applicants must demonstrate compliance with the zoning requirements for adult entertainment clubs set forth in sections 86-88 and 86-201. See id. Section 86-88 provides the site development standards for adult entertainment clubs including setbacks, landscape buffer zones, and parking requirements.[2] Section 86-201(a)(2)(f) provides that "adult use," including adult entertainment clubs, is not permitted in industrial districts.[3]

---

[2] Section 86-88, in relevant part, states:

> (a) Site plan required. Each application for a special permit shall be accompanied by a site plan for the location of the proposed adult use, accurately depicting the structures and other improvements existing on the lot or to be constructed on the lot, demonstrating that the site shall comply with all setbacks, buffer zones and other dimensional requirements of this subdivision.
>
> (b) Dimensional requirements. Any building or structure containing an adult use shall meet the setback requirements and other dimensional controls of the appropriate district as specified in this chapter. For any property proposed to contain an adult use, the applicant for a special permit for such use shall demonstrate that the entire property shall comply with the requirements and controls in this subdivision following the establishment of such use on such property.
>
> (c) Parking and loading facilities. Parking and loading facilities shall be set back a minimum of 50 feet from any street or property line and 750 feet from any structure used in whole or in part for residential purposes. Drives providing vehicular access from a public or private way to parking and loading areas shall be setback a minimum of 50 feet from any property line. Adequate space for the parking of vehicles shall be permanently reserved at the following rates:
>
>> (1) One per each three seats of total seating capacity for restaurants, clubs and places of assembly.
>> (2) One per 200 square feet of gross floor area for retail establishments and office space.
>> (3) A minimum of one off-street loading facility properly screened from neighboring properties and streets.
>> (4) A minimum of eight parking spaces for any adult use.
>
> (d) Landscaping. A perimeter strip no less than four feet in width adjacent to any public or private way shall be permanently maintained and cultivated in grass, shrubs, flowers,

The instant case arises out of the permitting proceedings between Lund and the City of Fall River (the "City") under the ordinances described above. Lund applied for a special permit to operate an adult entertainment club at 139 Front Street in Fall River, Massachusetts. His proposed location did not comply with either sections 86-88 or 86-201. It fell within an industrial district, which was forbidden under section 86-201, and did not conform to numerous site development standards required under section 86-88. The building inspector consequently denied Lund's application for a special permit.

Lund appealed that decision to the Zoning Board of Appeals (the "Board"). On January 21, 2010, the Board held a hearing on Lund's application for a special permit. Lund requested variances from certain requirements under sections 86-88 and 86-201. The Board denied Lund's request for variances because those sections state that all zoning requirements "shall" be met, language that the Board interpreted to mean that the ordinances barred the Board from granting

---

   trees or other green ground cover, except for the openings provided for pedestrian sidewalks connecting to the public sidewalks and for the openings provided for vehicular entrance and exit.

[3] Section 86-201 states:

   (a)  Uses. In an Industrial District, no structure or land *shall* be used except for one or more of the following uses: . . .

   (2) Existing mill buildings in existence prior to 1950 may be altered, reconstructed and used for:
       (a) Office of any kind including medical office;
       (b) Retail store or outlet;
       (c) Bank or other financial institution;
       (d) Restaurant or other eating place; and
       (e) Uses customarily accessory to such uses.
       (f) Art use . . . , *except adult use as defined in section 86-81 is prohibited.*

   (b) Additional Requirements, as follows: . . .

   (2) All buildings and outdoor storage or work areas shall be set back at least 20 feet from any street line and property line . . . .

(emphasis added).

variances. Without the variances, Lund's application for a special permit was doomed, and it was denied. Lund filed this action shortly thereafter.

**II.     Constitutionality of Sections 86-88 and 86-201**

Adult entertainment constitutes "expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566 (1991); accord D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 56 (1st Cir. 1999). This "does not guarantee the right to [engage in this expressive conduct] at all times and places or in any manner that may be desired." Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981); accord McCullen v. Coakley, 571 F.3d 167, 180 (1st Cir. 2009). A municipality may, when acting to further legitimate ends of the community, impose incidental burdens on this form of expressive conduct. See United States v. O'Brien, 391 U.S. 367, 376 (1968).

The constitutionality of zoning ordinances burdening places of adult entertainment is governed by the framework announced in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986). Renton requires courts to consider: first, whether the ordinances amount to a total ban on the use or rather only a "time, place, and manner" restriction; second, if a time, place, and manner restriction, whether the ordinances are content-based or content-neutral; and third, if content-neutral, whether the ordinances are narrowly tailored "to serve a substantial government interest and allows for reasonable alternative avenues of communication." Id. at 50; accord City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 434-35 (2002). At the hearing, Lund conceded that the sole question presented here is whether sections 86-88 and 86-201 provide reasonable alternative avenues of communication.[4,5]

---

[4] In his memorandum, Lund had argued, among other things, that section 86-201 constituted a total ban on adult entertainment, that sections 86-88 and 86-201 were content-based, and that the City failed to

To determine whether there exist reasonable alternative avenues of communication, a court must engage in a two-step process: first, determine what alternative avenues are available; and, second, determine whether those avenues provide a reasonable opportunity for the proposed communication. See Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1530 (9th Cir. 1993). The City bears the burden of proving the existence of reasonable alternative avenues of communication. See N.W. Enters., Inc. v. City of Houston, 352 F.3d 162, 182 (5th Cir. 2003).

A.   Alternative Avenues

With regard to the issue what alternative avenues of communication are available, the parties disagree about three key points: what amount of property do the city ordinances leave "available" to operate an adult entertainment club; whether current owners' unwillingness to sell or lease their property to Lund renders that property "unavailable"; and whether the property is "unavailable" if, for Lund to operate an adult entertainment club on that property, he would have to buy multiple parcels of land or spend a considerable amount of money to comply with city ordinances.

   1.   *The Property Available To Operate Adult Entertainment Club*

The total acreage of the City is 26,433 acres, but the total developable acreage is 11,783 acres, with the remainder being water bodies or land owned by the City or the Commonwealth of

---

adduce evidence showing that the ordinances serve a substantial government interest. These claims were not pressed at the hearing.

5  "Mr. Cunha: My suggestion, Judge – I don't think that there's any facts in dispute here. And I know I said at the beginning just a preliminary injunction, but I don't see why we can't – you can't make a summary judgment decision as well. I don't think that there's any factual dispute, that I have heard, between the two experts. There are different scenarios that they've presented but, you know, our position is –

"The Court: Well, I think that may be true with respect to the issue whether under the applicable law that the – the crux of the matter comes to the availability question; that is, that it is a content-neutral substantial government interested narrowly tailored but the second – the second question, whether it leaves an adequate available alternative expression is the issue. If that's the framing of the issue only, then I think we have all the evidence we need to decide the merits of the case one way or the other.

"Mr. Cunha: And I don't disagree."
(June 3, 2010 Tr. 59:19-60:12)

Massachusetts. The parties have proposed different numbers for the amount of land available for adult entertainment clubs within these 11,783 acres.

The City first argues that 2,558 acres or twenty-two percent of its total developable acreage remains open to "adult use" so long as the "adult use" constitutes no more than twenty percent of a business. Although this assertion may be accurate, it is an evasion of the constitutional question presented here. A municipality provides reasonable alternative avenues of communication where the land available "afford[s] adult establishments a reasonable opportunity to locate." Isbell v. City of San Diego, 258 F.3d 1108, 1112 (9th Cir. 2001); accord Renton, 475 U.S. at 54 ("[T]he First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult entertainment theater within the city . . . ."). Lund's proposed adult entertainment club cannot locate on most of the 2,558 acres identified by the City because an adult entertainment club, by definition, has more than twenty percent of its business devoted to "adult use." See Fall River, Mass., Rev. Ordinances § 86-81.

The City more seriously argues that when "adult use" is more than twenty percent of a business, it is permitted on 967 acres or 8.2% of developable land in the City, so long as the site development standards under section 86-88 are met. This assertion is also misleading because the City concedes that most of the 967 acres cannot comply with the site development standards under section 86-88.

Land that does meet the site development standards under that section amounts, according to the City, to 28.53 acres or 0.24% of the City's total developable acreage.[6] Lund

---

[6] The land is located in a Local Business District and includes Parcels C-11-7, D-19-1, and D-19-91 through -94. Parcel C-11-7, located just west of William S. Canning Boulevard, has 7.03 acres available. The "D" parcels, located just east of William S. Canning Boulevard, have 21.5 acres available.

disputes the City's 28.53 acre figure; he asserts that the property at issue is only 8.2 acres. However, Lund's own expert, the City's expert, and the exhibits submitted all contradict this assertion.[7] The 8.2 acres cited by Lund is not the property that may be used for an adult entertainment club; rather, it is the property that may be used as *parking* for the adult entertainment club. (See, e.g., Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. Ex. U, ¶ 7 ("The *parking* area available on Parcel C-11-7 . . . is approximately 1 acre in area.") (emphasis added).) Because Lund's assertion lacks evidentiary support, whereas the City's figure is well-supported by the testimony and exhibits presented, the Court accepts the City's figure and finds that 28.53 acres or 0.24% of the City's total developable land is the land "available" under the City's ordinances for use as an adult entertainment club.

### 2. *Costs of Development and Unwillingness to Sell*

Lund argues that these 28.53 acres are not "available" for adult use because, to establish and operate his club there, he would have to buy multiple parcels and spend a considerable amount of money developing the property in order to comply with the City's ordinances. Having carefully considered his arguments, I decline to find any of the 28.53-acre area "unavailable" under Renton.

First, the Supreme Court has cautioned against considering in First Amendment analyses the economic impact of ordinances upon speech-related business, Renton, 475 U.S. at 54, and the plaintiff's argument here, which focuses on the cost to establish and operate an adult entertainment club, is primarily one of economic impact upon his speech-related business.

Second, the properties here are of a much different character than the properties that have been deemed "unavailable" by other courts. In those situations, the land was unsuitable for any generic commercial enterprise. See Woodall v. City of El Paso, 49 F.3d 1120, 1124 (5th Cir.

---

[7] The City's parking figures are slightly different, i.e., 6.72 acres. (Def.'s Ex. 6.)

1995) (examples of unavailable property include land under the ocean, airstrips of international airports, sports stadiums); Topanga, 989 F.2d at 1532 (similar). Here, the properties currently are operated by generic commercial enterprises such as a K-Mart, a Sovereign Bank, and a Shaw's Supermarket.

Third, at least one federal appellate court has found sites to qualify as "available" where, as here, the plaintiff needed to purchase multiple parcels of land and to undertake significant development for its business to comply with local ordinances. David Vincent, Inc. v. Broward Cnty., Fla., 200 F.3d 1325, 1334-35 (11th Cir. 2000); see also TJS of New York, Inc. v. Town of Smithtown, 598 F.3d 17, 28-29 (2d Cir. 2010) (sites "available" although sizes of sites and nature of current businesses possibly made sites commercially unviable for an adult business such as plaintiff's).

Fourth, the current owners' possible unwillingness to rent or sell property to Lund is, without more, irrelevant to considerations of "availability" under Renton. See Renton, 475 U.S. at 54 ("That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation."); accord Woodall, 49 F.3d at 1125-26 ("The Adult Businesses claimed that some sites were unavailable because the owner of the site probably would not rent or sell to an adult business, or because the building was currently occupied or leased, neither of which is of any obvious concern under Renton."); Alexander v. City of Minneapolis, 928 F.2d 278, 283 (8th Cir. 1991) ("Additional testimony from Alexander that no one would sell or lease property on which he could relocate his businesses was also irrelevant to the First Amendment inquiry.").[8]

---

[8] Common sense also dictates that Lund's argument here be rejected. It would be odd, indeed, for the Constitution to require a municipality to rewrite its zoning ordinances based on the shifting preferences of whoever happens to own relevant property at any given moment.

For the reasons stated above, the entire 28.53 acres properly are deemed "available" for purposes of the Renton analysis. The question, then, remaining is whether this available property provides a reasonable opportunity for communication, that is, reasonable alternative avenues of communication here.

> B.  Reasonable Opportunity

While no single dispositive consideration exists when determining whether government ordinances provide reasonable opportunity for communication, relevant considerations include, among other things, the percentage of land available for adult use compared with the City's total acreage and the number of sites available to adult entertainment. D.H.L. Assocs., Inc., 199 F.3d at 59-60.

> *1.  Percentage of Land*

As noted above, the City contains 11,783 total acres of developable land of which 28.53 acres are available for operation of an adult entertainment club. As a result, 0.24% of the City's total developable land is available for such a club.

Whether 0.24% of the City's total developable land provides Lund with reasonable alternative avenues of communication is a close question. Renton held that a regulation leaving "more than five percent of the entire land of Renton[] open to use as adult theater sites" allowed for reasonable alternative avenues of communication, 475 U.S. at 53, but no post-Renton decision from the Supreme Court has attempted to delineate "a specific proportion of a municipality [that must] be open for adult businesses or that a certain number of sites be available," D.H.L. Assocs., Inc., 199 F.3d at 60 (internal citations and quotations omitted). Because of this uncertainty, lower courts have taken different views as to what percentage of land available for adult entertainment provides reasonable alternative avenues of communication.

9

Compare 3570 E. Foothill Blvd., Inc. v. City of Pasadena, 912 F. Supp. 1257, 1266 (C.D. Cal. 1995) (having between 0.73% and 0.95% of city acreage available for adult entertainment may be constitutional), with Franklin Jefferson Ltd. v. City of Columbus, 211 F. Supp. 2d 954, 960 (S.D. Ohio 2002) (having less than 1% of city acreage available may be unconstitutional).

D.H.L. Associates, Inc. offers the only guidance from the First Circuit. There, the First Circuit deemed constitutional a zoning ordinance leaving .099% of the Town of Tyngsborough available for adult entertainment businesses. 199 F.3d at 59. Lund asserts that D.H.L. Associates, Inc. is distinguishable on its facts. In finding that the ordinance provided reasonable alternative avenues for communication, the First Circuit relied in part on the rural character of Tyngsborough. See id. at 60. The City of Fall River, as emphasized by Lund, has a markedly different character. It is one of the largest industrial cities in Massachusetts. While the factual distinction is noted, D.H.L. Associates, Inc. teaches only that a somewhat higher level of available land might be necessary to assure reasonable alternative locations in a developed urban environment than in an undeveloped rural one. That is true in Fall River's case. Sections 86-88 and 86-201 leave 0.24% of the City's total developable acreage, somewhat more than the percentage approved in D.H.L. Associates.

    2. *Number of Sites*

The number of possible sites is a more practical measure than a percentage of area. Here the evidence indicates that there are at least eight sites available for adult entertainment businesses. In his evaluation of the parcels, the City's expert properly calculated how many sites are available in light of possible development and construction on those properties. See David Vincent, Inc., 200 F.3d at 1334-35. He testified that Parcel C-11-7 could host more than one

adult entertainment business and that Parcels D-19-1, -91, and -93 could host six.[9] (June 3, 2010 Tr. 46:24-47:4; 48:22-49:7.) If eight sites were available to adult businesses, then that would be a 63% increase over the five sites which the Court found to be constitutionally sufficient in D.H.L. Associates, Inc.. 199 F.3d at 60-61.[10]

Furthermore, courts have explained that reasonable opportunity of communication may exist when the number of sites available to adult businesses are greater than the number of adult businesses individuals have opened or have sought to open on those sites. See D.H.L. Assocs., Inc., 199 F.3d at 60; Steiner v. Cnty. Comm'rs of Caroline Cnty., 490 F. Supp. 2d 617, 626 (D. Md. 2007). Here, neither party has presented evidence that anyone other than Lund has opened or has sought to open an adult entertainment business under these ordinances. D.H.L. Associates., Inc. and Steiner thus suggest that, under these particular circumstances, the eight sites available provide sufficient opportunity for the communication here at issue.

## III.   Conclusion

In sum, both the percentage of land and the number of sites available for the communication here at issue indicate that sections 86-88 and 86-201 of the Revised Code of Ordinances of the City of Fall River provide Lund with reasonable alternative avenues for communication. The ordinances as applied to Lund's application do not infringe his First Amendment rights. Judgment shall enter in favor of the defendant City of Fall River.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

---

[9] In determining how many adult entertainment clubs those parcels could host, the City's expert considered the space available for the club itself and the space available for parking.
[10] I analyzed the constitutionality based on eight sites. The actual number available is surely greater. The calculations above take no account of Parcel D-19-92. (See Def.'s Ex. 6.) They also discount Harnett's affidavit stating that Parcels D-19-1, -92, -93, and -94 alone could host ten adult businesses.